**BAKER & SLIDER, LLC**
ATTORNEYS AT LAW
298 EAST WASHINGTON STREET
ATHENS, GEORGIA 30601
OFFICE 706.208.1514
FAX 706.208.1939

JOHN HOLLIS BAKER                                                                                      D. JASON SLIDER

August 10, 2022

Georgia Farm Bureau Insurance Company
c/o William P. Horkan (Counsel for GFBMIC)
James-Bates-Brannan-Groover-LLP
231 Riverside Drive
Macon, GA 31201

Auto-Owner's Insurance
Attn: Aaron Varnado AINS, AJC, LPCS
1735 N. Brown Rd.
Lawrenceville, GA 30043

Mr. Benjamin Durant Fierman
Fierman Law Firm
296 N. Main St.
Madison, GA 30650

Re:     1.    **Georgia Farm Bureau**
                 Claim No. BA-318290
                 GFB Farm Owner's Policy FR01159851405 - $500,000.00 Limit
                 GFB Auto Policy BAP3213532-10 - $100,000.00
                 GFB Business/Commercial Policy BAP3213532-13 - $100,000 Limit

         2.    **Auto-Owner's Insurance**
                 Claim No. 300-0394345-2022
                 Commercial Policy 48-038-700-01
                 Commercial Liability $1,000,000.00 Limit
                 Excess Umbrella Liability $5,000,000.00 Limit

Via:    1. Email to WHorkan@JamesBatesLLP.com
         3. Email to Aaron.Varnado@aoins.com
         4. Email to BDFierman@FiermanLawFirm.com

Dear Mr. Horkan, Mr. Varnado, and Mr. Fierman:

I am authorized by my Client, Bryson Jackson, to make this demand on his behalf, which provides the above-referenced insurers with the opportunity to settle these claims against their respective insureds.[1] The hyperlinks appearing below should allow you to access all materials in support of Bryson's claim; but, if you have any difficulty accessing those, please do not hesitate to let me know.



## SUMMARY

On June 28, 2020, Bryson was accidentally shot with a 9mm "hollow point" round by a 15 year-old child, Parker Cantrell. The gunshot wound resulted in three (3) separate surgical amputations of his right leg, a "necrotizing infection", a month-long hospitalization, and "phantom limb pain" which, like Bryson's disability, is presumed to be permanent. As insult to that injury, Bryson suffers knowing that this would never have occurred in the absence of egregious negligence. The child's father, Brad Cantrell, admittedly gave the child permission to "get the gun if he needs it...to shoot in the yard at home and sometimes with certain friends."[2] That is shocking for many reasons, including the express warning in bold and caps on the box of ammunition photographed by first responders.

---

[1] This Demand is intended to be wholly distinct from the demand sent on August 9th, 2022. The demand made on August 9th, 2022 was withdrawn prior to acceptance; and, should therefore be disregarded.
[2] See Incident Report



Under these circumstances, my Client makes this demand for $4,000,000.00 in consideration of statutory limited liability releases of claims for all above-referenced insurers and their respective insureds.

## LITIGATION STATUS

I received this case only weeks before the expiration of the statute of limitations; and, had insufficient time to attempt settlement discussions before filing suit. As evidenced by the [Superior Court Pleadings](), this case has been filed, served, and answered by all Defendants. On behalf of his Clients, Mr. Fierman provided insurance policy information to allow for informal settlement discussions with the insurers; and, in consideration thereof, I agreed to temporarily stay any deadlines related to the case. I appreciate Mr. Fierman's approach in that regard because it shows that he prioritizes the interests of his Clients. This demand provides both insurers with an opportunity to do the same thing, in keeping with their common-law duty to protect the interests of their insureds against the cognizable threat of an excess judgment presented by the circumstances of this case.

## COMMON-LAW BAD FAITH

Georgia's recognition of the common law claim of bad faith has been well-established for decades. The claim relates to the fiduciary duty of a liability insurer to protect its insureds from the risks of exposure to damages. In particular, "an insurance company may be liable for damages to its insured for failing to settle the claim of an injured person where the insurer is guilty of negligence, fraud, or bad faith in failing to compromise the claim."[3] As you all know, the classic example of bad faith relates to an insurance company's failure to take advantage of a reasonable opportunity to settle claims against its insured within policy limits, which then results in a judgment against its insured in excess of policy limits.[4] For 60 years, it has been the rule in

---

[3] [Holt]()
[4] See [Brightman]()

Georgia that "Negligent, as well as bad faith, failure to settle is actionable…"[5] Accordingly, you are required by law to give due consideration to the interests of your insureds when considering this opportunity to settle my Client's claims against them, which would abate exposure to liability for an excess judgment.

## INJURIES AND HOSPITALIZATION

You have all received the Complaint, the Incident Report, my Client's Affidavit, and photographs relating the facts underlying these claims. In supplementation thereof, the Records from Piedmont Hospital related to my Clients hospital stay from June 28th to July 16th, totaling more than 3000 pages, document my Client's course of treatment following his gunshot injury in unsettling detail. Before he arrived at the Piedmont ED, a team was pre-notified of his arrival for a "Level II Trauma Activation." It was estimated that Bryson had already lost "approximately 400 cc of blood…in the cab of the truck" prior to his arrival at Piedmont Hospital. That approximation should be regarded as conservative, based on the photograph of the floorboard of the truck Bryson occupied when he was shot. Bryson reported a "10 out of 10" pain on arrival at the ED, although he was "unable to feel his lower extremity/foot." He was initially assessed with a 1) gunshot wound of right lower leg with complication; 2) Injury of right popliteal artery; and, 3) Fracture of distal end of right femur. The physician noted that Bryson's "distal foot is pale and I am unable to appreciate pulses" before alerting trauma and vascular surgeons. According to diagnostics, "small metallic fragments are seen in the soft tissues posterior to the knee likely representing bullet fragments."



---
[5] Smoot; Phillips

Bryson was immediately admitted for surgery, where Dr. Pearce performed "4 compartment fasciotomies" in an attempt to restore perfusion to Bryson's lower right leg based on "compartment syndrome."  When the surgery proved unsuccessful, the next day, Dr. Pearce performed a "right femoral to below knee popliteal artery bypass." Unfortunately, both surgeries proved unsuccessful to restore blood flow to Bryson's right leg, which prompted Bryson's physician to disclose the fact that he was expected to require the amputation of his leg.  One thing Bryson was not told is that he would ultimately be required to undergo three separate amputations.





*First Amputation July 3rd, 2020 – "Guillotine" Below the Knee*

     In the absence of blood flow, Bryson needed a "BKA" (Below Knee Amputation) described as a "guillotine amputation right foot through tibia and fibular with debridement of necrotic tissue" on July 3rd. According to surgical notes, this included the use of an "oscillating saw" to "divide the tibia and fibula." (p. 44) For many reasons, below the knee amputations are objectively associated with better functional outcomes than those above the knee. For example, preservation of the knee joint leads to "less energy expenditure and better proprioception than an above the knee amputee" and "near the normal level of function."[6] Unfortunately, due to continuing complications, any attempt to restore Bryson to "near normal" proved unsuccessful.

---

[6] [Principles of Amputation](#)



*Second Amputation Surgery on July 8th, 2020 - Through-Knee Amputation*

In the presence of "abscess medial thigh myonecrosis of the below-knee amputation stump", Bryson went under the knife once again for a "through knee" amputation. The "debridement" of Bryson's leg, which was explained to him as "scraping", was performed at the time of his 2nd amputation. The "scraping" was done yet again two days later based on "4 to 5 cm of full-thickness necrosis of the edge of the posterior flap."

*Third Amputation Surgery on July 10th, 2020 – Above the Knee Amputation*

On July 10th, Bryson was evaluated for a "dressing change and possible amputation revision." Bryson's surgeon ultimately "elected to shorten the femur…with a oscillating saw." In the absence of evidence of further necrotic tissue, "bone wax" was then applied to the femur and where "the skin edges could not be safely reapproximated without undue tension."



As shown by the records, at some point while he was hospitalized at Piedmont, in addition to the three separate amputation surgeries and multiple "scraping" surgeries, Bryson suffered life-threatening problems with his other leg. Bryson developed an "acute embolism and thrombosis of left distal lower extremity" prompting the administration of Heparin. Thereafter, in what was described to Bryson as a "flesh eating disease" induced by an "allergic reaction" to the Heparin, he was diagnosed with "HIT", which is shorthand for "Heparin Induced Thrombocytopenia."

When Bryson was discharged to another hospital, his total charges for services at Piedmont Hospital exceeded $400,000.00.

On July 16th, Bryson was discharged to St. Mary's Hospital for post-surgical care. At St. Mary's, he received pain medications for management of "phantom limb pain." The St. Mary's records reflect that Bryson's amputations were complicated by a "necrotizing infection" and that he had reportedly received 23 units of blood." He was eventually discharged from St. Mary's on July 28th. The medical charges for Bryson's care at St. Mary's are presently unknown, although they have been requested.

### Clear Liability

In the absence of bad faith, both insurers should regard this as a case of clear liability and coverage. As previously disclosed, in lieu of express warnings against it, as well as the ordinary care and common sense any reasonable parent might employ, Brad Cantrell allowed his 15 year-old child to use a 9mm pistol loaded with hollow point ammunition around his friends. It may not be disputed that the pistol was stored at the physical address referenced by policy language as both Cantrell's "farm" and his "LLC." The subject vehicle, while registered in Cantrell's name, was a work truck Cantrell

provided to his full-time employee as a benefit of his employment to drive *every single day*, including the date the accident occurred. On these facts, even without the benefit of discovery, both insurers should assume that a jury would hold all Defendants liable because their charge would require it:

> *Every person shall be liable for the wrongful conduct or torts committed by a spouse, a child, or an employee by direction or in the prosecution and within the scope of the person's business, whether the same are committed by negligence or voluntarily.[7]*

Given those circumstances, a refusal to settle this claim citing frivolous "coverage" grounds would amount to bad faith; and, the liability analysis is exactly the same. Cantrell gave his child permission to use a loaded gun, which is the prototypical example of a "dangerous instrumentality" in Georgia. Once again, the jury charge on that issue is dispositive to this straightforward analysis, which requires the insurers to assume that these Defendants will be found liable for Bryson's damages.

> *One who knowingly entrusts or gives a dangerous instrumentality to another person who is not competent to use it is legally responsible for injuries to third persons that result from its negligent use by the person.[8]*

## DAMAGES

Once liability against the Defendants/Insureds is assumed, as it should be, the insurers must then assess the likelihood of an excess verdict against their insureds. Given the exorbitant special and general damages a jury would consider in this case, an excess verdict against the insureds should be expected.

The known specials in this case exceed $400,000.00 before accounting for 12 days of hospitalization at St. Mary's and the expense of Bryson's prosthesis. While the insurers should presume that specials already exceed half a million dollars, the future expenses are what should concern the insurers the most. According to one study conducted by the Department of Veteran Affairs, Bryson should be expected to incur expenses for continued medical treatment and prosthetic limbs of at least 1.5 Million Dollars.[9] According to all studies and projections, the key factor for Bryson is the difference between the "near normal" functionality that may be achieved for below the knee amputees, versus his amputation above the knee. The loss of his knee joint means that prosthetics are more complicated, less functional, and more expensive. Some prosthesis employ microprocessors to limit pain that can cost as much as $100,000.00. Given actuarial figures, Bryson is expected live at least five decades and require many prosthetic devices over his lifetime. Under the circumstances, the insurers should assume

---

[7] 60.310 Negligence Amplified; Spouse, Child, or Employee, Georgia Suggested Pattern Jury Instructions - Civil 60.310

[8] 60.410 Dangerous Instrumentalities; Entrusting to Others, Georgia Suggested Pattern Jury Instructions - Civil 60.410

[9] https://www.rehab.research.va.gov/jour/10/474/Blough.html

that past and present special damages, which a jury must award by law, to amount to at least $3,000,000.00 before general damages are even considered.

There are no words that could describe the physical pain Bryson has experienced due to the negligence of the Defendants in this case. A jury would be asked to quantify the amount of pain associated with the gunshot, which Bryson described as "10 out of 10", the compartment syndrome requiring surgical intervention, the thromboses he suffered while in the hospital, the "flesh eating disease" at his amputation wound, or the "scrapings" needed to take increasingly more of his necrotic flesh. While all of that occurred in the two weeks following the injury, that was only the beginning. According to Bryson, in addition to the horrible pain he endured following his many surgeries, it has been the pain since he was released from the hospital that has been worst of all. Bryson does not suffer pain that comes and goes in his right leg, he suffers from pain at every waking moment. The more he ambulates, the more it hurts; and, without the funds to upgrade his prosthetic device, there is no relief in sight. Bryson also suffers from "phantom limb pain", which is common among those in his circumstances. The pain is maddening. It presents as burning or, even worse, a burning itch that cannot be scratched. He often wakes in the middle of the night to the sensation of a burning itch and, when he reaches for his leg to make it stop, he is reminded it is not there and there is nothing that will stop it.

It is similarly impossible to effectively describe the mental anguish Bryson has suffered due to his injuries. One need only imagine what it was like for him to hear for the first time that he would lose his leg; or, the discussions with his Doctors about a second amputation, and then a third. Just 20 years of age at the time of his injury, Bryson was in the physical prime and loved playing basketball more than anything. That is gone. His ability to do most things other people can do is gone. His ability to work most jobs that other people can work is gone. There is no waking up from that nightmare for Bryson, just a life of needless physical and emotional suffering. According to law, that suffering is something the Defendants, and their insurers, are liable for.

### VERIFICATION OF INSURANCE POLICIES AND LIMITS

I provided my Client's Affidavit to the representatives or counsel for both insurers on July 22, 2022; however, I have not yet received "each known policy of insurance issued by it, including excess or umbrella insurance, the name of the insurer, the name of each insured, and the limits of coverage." O.C.G.A. § 33-3-28  As such, the only insurance policy information relating to these Defendants/Insureds was provided by independent Counsel for Defendants, Mr. Fierman; and, the above-referenced policies and limits are stated upon information and belief, subject to verification and supplementation by the insurers.

Under these circumstances, my Client expressly conditions his offer to settle upon verification by both insurers as to the policies and limits known for these insureds/Defendants. I understand that Mr. Horkan is currently working to obtain that information from GFB; and, I appreciate his efforts to do so. I would respectfully

request that Mr. Varnado confirm in writing what I was told by one of his colleagues, in that Auto-Owner's insures Defendants with a $1,000,000.00 general commercial liability policy and a $5,000,000.00 excess liability umbrella policy. Once all known policies and their limits are disclosed and verified, since I lack information to determine priority between the multiple policies, that is an issue that I will leave to the insurers to discuss in keeping with their obligations of common-law good faith.

### DEMAND

My Client has authorized me to settle all his claims in consideration of lump-sum payments for Defendants totaling $4,000,000.00, subject to the following terms and conditions:

- This offer shall remain open for acceptance until 5:00 p.m. on September 9th, 2022, after which time the offer shall automatically expire without further notice;
- This offer may be accepted by delivering certified funds totaling $4,000,000.00 to the offices of Baker & Slider, LLC prior to September 9th, 2022 and made payable to "Bryson Jackson and his Attorneys Baker & Slider, LLC"[10]
- My Client would be solely responsible for any outstanding medical bills or claims of liens associated therewith; and
- Upon receipt of certified funds totaling $4,000,000.00, within 5 days, my Client will dismiss the pending civil action against Defendants with prejudice and execute statutory limited liability releases for the benefit of Defendants and their insurers.

Sincerely,

John Hollis Baker, Esq.

---

[10] "an insurance company faced with a demand involving multiple insurers can create a safe harbor from liability for an insured's bad faith claim under *Holt* by meeting the portion of the demand over which it has control, thus doing what it can to effectuate the settlement of the claims against its insured. This rule is intended to protect the financial interests of policyholders in cases where continued litigation would expose them to a judgment exceeding their policy limits while protecting insurers from bad faith claims when there are conditions involved in the settlement demand over which they have no control."
*Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 686, 580 S.E.2d 519, 522 (2003)